UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Robert Swinney,

        Plaintiff,

v.

AMcomm Telecommunications, Inc.,

        Defendant.

_____/

Case No. 12-12925

Honorable Nancy G. Edmunds

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S SECOND MOTION FOR CONDITIONAL CERTIFICATION [46]

Plaintiff Robert Swinney has filed a Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, claim against his employer Defendant AMcomm Telecommunications, Inc., alleging that Defendant misclassified him as an "independent contractor," when he was performing the same work as Defendant's employees, and therefore entitled to overtime pay and other benefits.[1]  (Dkt. 1, Compl.)

On September 18, 2012, Plaintiff filed his first motion for conditional class certification. The Court denied Plaintiff's motion without prejudice.  (Dkt. 21.)  The Court found that Plaintiff failed to meet the lenient standard for conditional certification and instead only made conclusory allegations in support of certification.

_____

[1]Defendant is a telecommunications company involved in telephone and cable and internet installation.  Defendant states that its employees perform 80% of the work involved with the company's business.  It further states that it utilizes independent contractors for overflow work and that these independent contractors "sign independent contractor agreements [that] specifically set forth the nature of the relationship as that of an independent contractor as opposed to an employee."  (Def.'s Resp. at 1.)

Plaintiff now files this second motion for conditional certification. (Dkt. 46.) Defendant again opposes. (Dkt. 50.) Since the first motion, Plaintiff has conducted limited discovery. He conducted depositions of several of Defendant's managers and served interrogatories on Defendant. He uses that discovery, along with his supplemental affidavit, Leslie Wardell's original affidavit and supplemental affidavit, and Appie Cook's new affidavit, to support his argument that he has met the lenient standard for conditional class certification for his FLSA claim. (Pl.'s 2d Mot. at 4-5.) In his reply, Plaintiff adds four additional declarations of former Defendant's employees. (Dkt. 56.) Based on this additional evidence, Plaintiff alleges that he has demonstrated that a class of over one hundred technicians were classified as independent contractors who were actually working as employees. (Pl.'s 2d Mot. at 5.) He therefore again argues that he is entitled to conditional certification of the following class:

> All persons who, at any time since September 17, 2009 (1) have worked as cable installation technicians for AMcomm Telecommunications, Inc. within the state of Michigan; (2) have been classified as "independent contractors"; and (3) have not been paid time and a half for hours worked over forty in a workweek.

The Court finds that Plaintiff has now met the lenient standard necessary for conditional certification of a class based out of the White Lake warehouse. While the Court recognizes that Defendant has submitted affidavits and evidence that attack and discredit Plaintiff's evidence, the Court's function on this motion is not to weigh the evidence, but simply to evaluate whether Plaintiff has made the necessary allegations for conditional certification. The Court finds that he has.

For the reasons more fully explained below, the Court GRANTS in PART Plaintiff's motion.

2

## I.   Analysis

Plaintiff alleges that Defendant violated the FLSA because he and the other independent contractors were actually employees entitled to overtime pay.  "Section 207(a) of the FLSA requires employers to pay time-and-a-half for employee labor exceeding forty hours per week."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 545 (6th Cir. 2006).  The FLSA exempts certain types of employees and workers associated with an employer from the statutory overtime payment requirement.  *Id.*, *see* 29 U.S.C. § 213.

### A. Conditional class certification - general principles

Plaintiff seeks conditional class certification and judicial notice of a collective action as allowed under § 216(b) of the FLSA.  Section 216(b) provides that:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated*.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added).  As the Sixth Circuit has observed, "[u]nlike class actions under [Rule] 23, collective actions under FLSA require putative class members to opt into the class," and "[t]hese opt-in employees are party plaintiffs, unlike absent class members in a Rule 23 class action."  *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 583 (6th Cir. 2009).  Suits brought under § 216(b) of the FLSA are thus called "collective actions," not class actions.  *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).

Section 216(b) "establishes two requirements for a representative action" brought by employees "in their own behalf and for 'similarly situated' persons."  *Id.*  First, "the [named]

plaintiffs must actually be 'similarly situated,'" and second, "all plaintiffs must signal in writing their affirmative consent to participate in the action." *Id.* (citing 29 U.S.C. § 216(b) and *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 167-68 (1989)). The district court's task is to "first consider whether plaintiffs have shown that the employees to be notified" of the collective action "are, in fact, 'similarly situated.'" *Id.* If the plaintiffs meet this burden, then "[t]he district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit." *Id.*

Although the phrase "similarly situated" is undefined, "the Sixth Circuit has recognized that district courts typically 'follow[ ] a two-stage certification process . . . to determine whether the opt-in plaintiffs and lead plaintiffs [are] similarly situated.'" *Noble v. Serco, Inc.*, No. 3:08-76-DCR, 2009 WL 3154252, *1 (E.D. Ky. Sept. 28, 2009) (quoting *O'Brien*, 575 F.3d at 583 and citing *Comer*, 454 F.3d at 546). The first stage of § 216(b) certification, also known as the "notice stage," takes place early in the litigation; i.e., "at the beginning of discovery." *Comer*, 454 F.3d at 546. At this notice stage "the court determines whether the suit should be 'conditionally certified' as a collective action so that potential opt-in plaintiffs can be notified of the suit's existence and of their right to participate." *Noble*, 2009 WL 3154252 at *1. The second stage occurs later, "after all of the opt-in forms have been received and discovery has been concluded." *Comer*, 454 F.3d at 546 (internal quotation marks and citation omitted).

Plaintiff's motion here involves this first or "notice" stage and seeks only conditional, not final, certification. "The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs." *O'Brien*, 575 F.3d at 584. Plaintiff's burden under the FLSA is less stringent than that required for class certification under Rule

23 of the Federal Rules of Civil Procedure. *Id.* (observing that the district court erred when it "applied a Rule 23-type analysis" and found "that the plaintiffs were not similarly situated because individualized questions predominated."). To be considered "similarly situated," it is sufficient if plaintiffs' "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of those theories are inevitably individualized and distinct." *Id.* at 585. This common theory is a sufficient, but not a necessary, condition for a finding that a group of employees is similarly situated. *Id.* Moreover, as the Sixth Circuit observed in *Comer*, "[t]he plaintiff must show only that his position is similar, *not identical,* to the positions held by the putative class members." *Comer*, 454 F.3d at 546-47 (internal quotation marks and citations omitted and emphasis added). District courts generally allow the lead plaintiffs to "show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp.2d 545, 548 (E.D. Mich. 2004) (internal quotation marks and citations omitted). *See also Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642 (W.D. Tenn. 2009) (same).

This "first stage" or notice standard is "fairly lenient," requiring only that Plaintiff "submit evidence establishing at least a colorable basis for [his] claim that a class of 'similarly situated' plaintiffs exists." *Olivo*, 374 F. Supp.2d at 548 (internal quotation marks and citation omitted). "[T]he Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Brasfield*, 257 F.R.D. at 642. *See also White v. Baptist Mem'l Health Care Corp.*, ___ F.3d ___, 2012 WL 5392621, at *6 (6th Cir. 2012 Nov. 6, 2012).

When a court has afforded limited discovery to a plaintiff, he may not rest on the unsupported allegations in his complaint, but must put forth a "modest factual showing" that the putative plaintiffs are similarly situated. *Jesiek v. Fire Pros, Inc.*, 275 F.R.D. 242 (W.D.Mich. 2011) (Maloney, C.J.) (citations omitted). *See also Wade v. Werner Trucking Co.*, 10-00270, 2012 WL 5378311 (S.D.Ohio Oct. 31, 2012). (discussing modest-plus standard when some conditional class discovery has taken place). *And see Bacon v. Eaton Aeroquip, LLC*, 11-14103, 2012 WL 6567603, at *3 (E.D.Mich. Dec. 17, 2012) (Drain, J.) (finding that, because the parties had engaged in limited discovery and the plaintiff had filed motions to compel discovery that the court must enact a "more exacting review of [the plaintiff's] factual support for granting class certification.").

**B. Plaintiff's factual showing**

In Plaintiff's second motion for conditional certification, he resubmits his affidavit and Leslie Wardell's affidavit, who now wishes to rejoin this case.[2]  Plaintiff and Wardell have submitted supplemental affidavits in support of this second motion as well.  Plaintiff has also submitted Appie Cook's affidavit and four other declarations to show that Defendant's independent contractors often worked over forty hours per week and were not paid overtime.  Plaintiff finally offers an exhibit setting forth an arguably loosely calculated table of independent contractors who worked more than forty hours per week.

**1. Plaintiff's affidavit and supplemental affidavit**

---

[2]Plaintiff explains that Mr. Wardell has elected to re-join the case.  (Pl.'s 2d Mot. at 9, n. 4.)  Plaintiff states that Mr. Wardell asked Defendant for his job back with Defendant. (*Id.*)  Plaintiff explains that Defendant's owner, Matt Schultz, conditioned Mr. Wardell's reemployment on his withdrawing from the suit.  (*Id.*)  Plaintiff adds that Mr. Wardell now desires to join the case again and that Mr. Wardell has filed a new case against Defendant. (*Id.*)

Plaintiff has submitted an affidavit in support of his motion for condition certification. (Pl.'s Mot., Ex. C, Pl.'s Aff.)

Plaintiff worked at Defendant from approximately October, 2010 until March, 2012, out of Defendant's White Lake, Michigan location.  (Pl.'s Aff. ¶¶ 1, 2.)  Plaintiff stated that he worked as an "independent contractor."  (*Id.*)  As an independent contract, Plaintiff stated that "[a]ll the work [he] performed was related to the installation and repair of high-speed internet, cable television, and telephone services for customers of Bright House Networks."  (*Id.* ¶ 3.)

Plaintiff stated that Defendant trained its independent contractors.  (Pl.'s Aff. ¶ 4.)  Plaintiff explained that Defendant required him to train with installation technicians for two weeks to learn how Defendant "wanted [] each job order carried out, and [] [was] trained by [Defendant] on how to perform such installations and repairs."  (*Id.*)  Plaintiff added that Defendant never paid him for the time he spent training.  (*Id.*)

Plaintiff stated that, for most of the time he worked at Defendant, he would arrive at the White Lake warehouse by 7 a.m.  (Pl.'s Aff. ¶ 5.)  Plaintiff stated that "[a]pproximately 50 other technicians who were allegedly 'independent contractors' would report to [White Lake] on a daily basis around 7:15."  (*Id.*)  Plaintiff added that there were other technicians who installed for Charter, who had to arrive much earlier, around 6 a.m.  (*Id.*)  Plaintiff stated that he did not know how many of these Charter technicians there were.  (*Id.*)

While working at Defendant, Plaintiff stated that Defendant would give work out to carry out cable installation services for the various cable company customers.  (Pl.'s Aff. ¶ 6.)  Plaintiff stated that Defendant's supervisors assigned the work orders.  (*Id.*)  And Plaintiff added that the independent contractors were required to have signage of

7

Defendant and the cable company for which they were performing work on their vehicles, and that they were required to wear Defendant shirts and badges. (*Id.*)

Plaintiff alleged that the independent contractors had no "discretion other than to follow the work order given to [them] by [Defendant] and to perform the work assigned at the times assigned." (Pl.'s Aff. ¶ 7.) Plaintiff stated that his job assignment times ranged from 8 a.m. to 10 p.m. (*Id.* ¶ 8.) He maintained that he was required to stay until the job was completed. (*Id.*)

Plaintiff stated that Defendant knew where he was at all times, because Defendant tracked all of its trucks by GPS. (Pl.'s Aff. ¶ 9.) Plaintiff stated that, "if [he] was called to do a last-minute job, [he] felt that [he] could not decline to take the job." (*Id.*) Plaintiff added that Defendant knew where its trucks had been and that it checked to see if the cable installation technicians "arrived to assigned jobs on time." (*Id.*)

Plaintiff explained that "Quality Control" inspected the jobs he performed. (Pl.'s Aff. ¶ 10.) Plaintiff further explained that, if Quality Control "did not like the quality of the job," Defendant would deduct a "charge back" from his pay. (*Id.*) Plaintiff stated that the Quality Control person was a Bright House employee, but Defendant deducted the charge back from his paycheck. (*Id.*) Plaintiff added that the "charge back" for any quality issue was $100.00, regardless of whether the job completed was worth less. (*Id.*) Plaintiff stated that he did not have the right to contest the reasons for his charge backs and that he was only told that he had to sign the charge back paperwork, which then resulted in the deduction. (*Id.*)

8

Plaintiff stated that Defendant paid the independent contractors on a per-job basis and gave a set amount for each job. (Pl.'s Aff. ¶ 12.)  Plaintiff added that the independent contractors did not have the ability to negotiate the amount of their payments.  (*Id.*)

Plaintiff stated that he and "virtually all of the cable installation technicians who worked for [Defendant], worked more than 40 hours each week." (Pl.'s Aff. ¶ 13.)  Plaintiff also stated that he and the other technicians would have to work five days a week, "between 60 and 80 hours a week and on no occasions were [they] ever paid overtime." (*Id.*)  If a technician left early, Plaintiff stated, he would be penalized by "being given low-value work, and/or [he] would be backcharged."  (*Id.* ¶ 14.)

Plaintiff alleged that, during the time he and other contractors performed work for Defendant "there was virtually no opportunity to work for any other cable installing company or to perform any other telecommunications work ." (Pl.'s Aff. ¶ 15.)  Plaintiff gave two reasons for not having the opportunity to work anywhere else.  (*Id.*)  He first stated that the independent contractors "were required to work all the time for [Defendant,] there was no time to [work for anyone else.]" (*Id.*)  The second reason, Plaintiff stated, was because he and the other contractors "were informed that [they] could not work for both a competitor of [Defendant] and [Defendant.]" (*Id.*)

Plaintiff maintained that, while working for Defendant, "all of the equipment which [he and the other contractors] installed or repaired was provided [by Defendant.]" (Pl.'s Aff. ¶ 16.)  Plaintiff added that, if he and the other contractors needed tools, they could get them from Defendant's warehouse and then Defendant would take the costs of the tools out of their paychecks.  (*Id.*)  Plaintiff also added that they had to rent and return some of the specialized tools on a daily basis.  (*Id.*)

9

Plaintiff then stated that, if Defendant "did not believe a technician was doing a good job, [it] would simply terminate the technician without notice. [Defendant] could also terminate technicians for no reason at all." (Pl.'s Aff. ¶ 17.)

Plaintiff has submitted a supplemental affidavit. (Pl.'s 2d Mot., Ex. 8, Pl.'s 2d Aff.) In this affidavit, Plaintiff provides additional information as to how he knows that other "technicians" were performing work for Defendant for more than forty hours per week. (*Id.*)

### 2. Leslie Wardell's affidavit and supplemental affidavit

Wardell stated that he worked as an independent contractor for Defendant from 2008 until 2011. (Wardell Aff. ¶¶ 1, 3.) Wardell explained that Defendant routed him work from various cable companies, including Bright House, WOW, and Charter Telecommunications. (*Id.* ¶ 3.) He also explained that he had to receive specialized training for each provider and that he never received payment for the time he spent training. (*Id.* ¶ 4.)

For most of his time working for Defendant, Wardell stated that he showed up at work at 7 a.m. (Wardell Aff. ¶ 5.) He said that he would arrive to the White Lake warehouse along with one hundred other technicians who were "allegedly" independent contractors. (*Id.*) There, Defendant would give the independent contractors work orders to carry out cable installation services for various cable company customers. (*Id.*) Wardell said that Defendant required the independent contractors to have AMcomm signage on their cars and to wear AMcomm shirts. (*Id.*)

Wardell stated that, when Defendant assigned him a work order, he had no discretion to not accept it. (Wardell Aff. ¶ 6.) He said he had worked until 10 p.m. sometimes. (*Id.* ¶ 7.) Wardell then explained the "charge back" fees for Bright House and WOW. (*Id.* ¶¶ 10, 11.)

10

Wardell stated that Defendant paid him on a per job basis. (Wardell Aff. ¶ 14.) He said that he and virtually all of the cable installation technicians worked more than forty hours per week, typically for six days per week. (*Id.* ¶ 15.) He added that he and the independent contractors never received overtime. (*Id.*) He stated that, if he left early or did not work a day, Defendant would penalize him by giving him low-value work or no work the subsequent days, or Defendant would back charge him. (*Id.* ¶ 16.)

The rest of his affidavit mirrored Plaintiff's affidavit.

Leslie Wardell provided a supplemental affidavit similar to Plaintiff's–explaining the factual basis surrounding his knowledge about the allegations in his original affidavit. (Pl.'s 2d Mot., Ex. 9, Wardel 2d Aff.)

### 3. Appie Cook's affidavit

In 2001, Defendant hired Cook to perform cable installation. (Pl.'s 2d Mot., Cook Aff. ¶ 4.) Cook stated that, beginning in 2007, he and other installation technicians working for Defendant, began reporting to Defendant's warehouse in White Lake, Michigan. (*Id.* ¶ 5.) Cook added that he reported to the White Lake warehouse every day between 7:00 and 8:00 a.m. (*Id.*) Cook explained that the warehouse had Defendant's name and logo on the side of the building and that the Defendant's managers and supervisors were in charge of the warehouse. (*Id.*) Prior to 2007, Cook stated that he and the other contractors who worked for Bright House would report directly to the Bright House warehouse to pick up routes and equipment. (*Id.* ¶ 6.) In 2007, Cook stated that Defendant's owner, Matt Schultz, met with all the cable installers and told them to no longer report to Bright House and to instead report to Defendant's warehouse because Defendant "did not want the

independent contractors . . . to interact with the employed installers working at Bright House directly." (*Id.* ¶ 7.)

Cook stated that, while working for Defendant, he was an "independent contractor," and all the work he performed was related to the installation and repair of high-speed internet, cable television, and telephone services for customers of Bright House. (Cook Aff. ¶ 8.) Cook added that he provided work for Defendant and that Defendant's employees directed him and other technicians how to perform the work for Defendant's clients. (*Id.* ¶ 9.) Cook explained that, when he and other technicians received work orders for the day, they had no discretion "other than to follow the work order given to [them] by [Defendant] and to perform the work assigned at the times assigned." (*Id.*) The jobs, Cook added, were scheduled in two-hour windows, starting at 8 a.m. and going until 8 p.m. (*Id.* ¶ 10.) Cook also added that Defendant instructed him as to which residences he would work on and what services he could provide to the customers. (*Id.* ¶ 11.) If a customer asked for an additional service that Defendant did not offer, Cook stated that he and other technicians had to turn the customer down. (*Id.* ¶ 12.) Cook explained that, if he did any work outside of work for Defendant, Defendant would subject him to certain fees. (*Id.*)

Cook maintained that Defendant told him that he could no longer work for Bright House because Defendant allegedly said that he was soliciting people for his own personal business while on Defendant's time. (Cook Aff. ¶ 12.)

Cook stated that, from 2007 through December, 2012, he reported to Defendant's offices every morning between 7 and 8 a.m. to receive his work orders. (Cook Aff. ¶ 14.) He added that Defendant employed at least seventy to one hundred other technicians "like" him whom Defendant classified as independent contractors and did not pay overtime. (*Id.*)

12

While working for Defendant, Cook stated that Defendant did not permit him and the other technicians to solicit additional work independent of the services that they provided for Defendant.  (*Id.* at 15.)

Cook explained how Defendant paid him.  (Cook Aff. ¶ 17.)  He said that Defendant paid him on a per job/task basis and gave him a set amount for each job.  (*Id.*)  He also said that he had no ability to negotiate the amount of payment, and that Defendant did all of the billing to the customer, and then paid the independent contractors.  (*Id.*)

Cook stated that, between 2009 and 2012, he attended meetings with other independent contractors that Defendant's management ran.  (Cook Aff. ¶ 19.)  He added that the meetings would include between fifteen and one hundred people, depending upon whether Defendant's technicians who worked for Charter Telecommunications were also present.  (*Id.* ¶ 20.)  Cook explained that approximately fifteen to twenty-five technicians worked for Bright House, while seventy to one hundred technicians worked for Charter. (*Id.*)  Cook stated that the meetings involved issues related to independent contractors.  (*Id.* ¶ 21.)  Also at the meetings, Cook said that Defendant and the other contractors discussed the possibility of shifting the contractors to employees.  (*Id.* ¶ 22.)  Cook recounted that Defendant told him and the other installers that, if they switched to being employees, they would not have to pay for Defendant's vehicles, gas, or phones.  (*Id.* ¶ 23.)

Cook explained that he had the choice to use his own car or one of Defendant's vehicles to perform installation.  (Cook Aff. ¶ 29.)  Cook stated that, if he used one of Defendant's vehicles, Defendant would deduct $75.00-125.00 from his paycheck every week.  (*Id.* ¶ 32.)  If he were to use his own vehicle, he stated that he would have to purchase a Defendant decal for the car, which cost $50.00, if he needed to replace it.  (*Id.*

13

¶ 33.)  Cook added that Defendant required every technician to purchase shirts that had Defendant's name on the front and back to wear while working.  (*Id.* ¶ 35.)  If the contractors were not wearing a shirt, Cook stated that Defendant would not give them work that day.  (*Id.* ¶ 36.)  Cook also stated that he and the other contractors had to purchase special tools to perform the installations and that they could purchase the tools directly from Defendant's warehouse. (*Id.* ¶ 37.)  Cook stated that he and the other technicians were required to record the amount of time they took on each job.  (*Id.* ¶ 38.)  He said that his pay per job ranged from $8.00 to $100.00.  (*Id.* ¶ 40.)  If the jobs had quality control issues, Cook stated that Defendant would charge a "back charge" that ranged from $50.00 to $100.00, depending upon the issue.  (*Id.* ¶ 41.)  Cook maintained that, even if Defendant found a small error, Defendant would charge him, even if the error did not result in any negative effect on the customer.  (*Id.* ) Cook said that Defendant charged him these back charges between five and ten times.  (*Id.* ¶ 42.)  He added that sometimes, Defendant would charge $100.00 on an $8.00 job.  (*Id.* ¶ 43.)  Cook explained that Defendant would charge back charges if the technicians drove outside of the service area or had unapproved people in Defendant's vehicle with them.  (*Id.* ¶ 44.) Back charges for driving outside the service area were $100.00; for unapproved people, $200.00.  (*Id.*)

Cook stated that "[v]irtually all the cable installation technicians and [he] worked more than 40 hours each week for [Defendant.]" (Cook Aff. ¶ 45.)  Cook added that the technicians worked at least six days per week and performed between sixty and eighty hours of work a week, without ever receiving overtime pay.  (*Id.* ¶¶ 45, 46.)  Cook maintained that there were weeks that he would work seven straight days without receiving

overtime pay. (*Id.* at 47.) When he worked seven days, he stated that he would see three to eight Bright House technicians reporting to work for a seventh day, as he did. (*Id.* ¶ 48.)

Cook stated that he knew that other technicians were working over forty hours per week for a variety of reasons, including:

- he would see other technicians' work orders when he would report to work each morning;

- he was able to determine, based on his experience, that Defendant assigned work for longer than an eight-hour period; and

- he would regularly discuss, with other technicians, the hours they were working for Defendant.

(Cook Aff. ¶¶ 50-52.)

Cook stated that Matthew Schultz told the technicians that the pay rate for technicians was the same for all jobs based on which cable company the technician worked for. (Cook Aff. ¶ 53.)

Cook revealed that the technicians would "regularly" trade work orders or fill in for each other if one technician could not do a job for some reason. (Cook Aff. ¶ 54.) Cook stated that, in these interactions, he was able to see the other technicians' work orders and see that the jobs would take longer than eight hours per day. (*Id.*) He also stated that he knew others were working more than eight hours per day and over forty hours per week because he would pass them late at night when he had seen them at the warehouse early in the morning. (*Id.* ¶ 54.)

Cook asserted that, in the summer of 2009, Defendant told him that he could not take a vacation; and that if he did take a vacation, Defendant would no longer permit him to work

15

for it.  (Cook Aff. ¶ 56.)  In December, 2012, Cook stated that Defendant told him that he could no longer work for Bright House, but that he could still work for Defendant.  (*Id.* ¶ 57.)  Cook chose not to work, he explained, because Defendant would pay him less and required him to be at work even earlier.  (*Id.* ¶ 58.)

### 4.  Plaintiff's additional evidence

Plaintiff has submitted four declarations from workers.  (Pl.'s Reply, Exs. 6-9.)  In these declarations, four former/current workers of Defendant state that they worked as installation technicians, were classified and compensated as independent contractors, "almost always worked more than 40 hours per week" and did not receive overtime for the hours they worked over forty hours.  (*Id.*)  They stated that they performed installation services for Charter Communications and WOW.  (*Id.*)

Plaintiff has also submitted Jacob Clark's affidavit.  (Pl.'s Reply, Ex. 2, Clark Aff.)  Clark, an intern at Plaintiff's counsel's firm, has submitted a list a sample weeks in which independent contractors worked over forty hours per week for Defendant.  (*Id.* ¶ 5.)  Clark compiled the list from Charter Communications and Bright House Networks documents. (*Id.* ¶ 7.)  Clark assumed a 7:30 a.m. start time for each of the workers, because Michael Smith testified that that time was when the independent contractors arrived to the warehouse to start work.  (*Id.* ¶ 9.)  Assuming that start time, Clark looked to the end times of the work orders to calculate the total number of hours worked daily and weekly.  (*Id.* ¶ 10.)  Clark stated that, once he found one week in which the independent contractor worked over forty hours, he did not determine whether the contractor worked any other over-forty work weeks.  (*Id.* ¶ 11.)  Clark's compilation shows that over ten independent contractors worked over forty hours for at least one week.

16

Plaintiff offers the numbers of independent contractors that have worked for Defendant for the last four years:

- 2009: 131

- 2010: 126

- 2011: 130

- 2012: 81

(Pl.'s 2d Mot., Ex. 2.)

### C. Michael Smith's deposition testimony

Plaintiff took Michael Smith's deposition. Smith's testimony directly contradicts many of Plaintiff's assertions in the affidavits. Smith is Defendant's operations manager. (Pl.'s 2d Mot., Ex. 1, Smith Dep.)

Smith stated that the employees and contractors both report to the White Lake office. (*Id.* at 8.) He added that there are more employees than contractors. (*Id.*) His duties, he explained, consisted of being in charge of daily operations, billing, and how the work is routed. (*Id.*) Smith stated that he was operations manager of several cable companies through AMcomm, Charter and Bright House. (*Id.* at 9.)

Smith explained the process of assigning jobs to independent contractors. Smith stated that he received work orders from Bright House, approximately ninety percent of its field work, the night before the work is needs to be completed. (Smith Dep. at 14.) Smith explained that he assigned jobs to the in-house technicians first and then to the contractors. (*Id.*)

Smith stated that contractors work as much as they want, and that he did not "force them to do anything." (Smith Dep. at 18.) He explained that contractors could work seven

17

days per week if they chose to.  (*Id.*)  He said no contractors worked seven days, though, but that some worked six days per week.  (*Id.* at 18-19.)

Smith testified that the work employees and contractors do is the same, although they have different pay rates.  (Smith Dep. at 22.)

Smith stated that Defendant did not hold meetings for contractors to inform them about new developments and technology.  (Smith Dep. at 21.)  He explained that contractors received this type of information from literature.  (*Id.*)

Smith stated that Defendant only requires technicians to wear IDs.  (Smith Dep. at 32-33.)  Smith stated that Defendant did not require the independent contractors to wear shirts with Defendant's logo on them.  (*Id.* at 33.)

Smith also testified that Defendant had locations in Coldwater, Kalamazoo, and Mount Morris, in addition to White Lake.  (Smith Dep. at 23.)  There are contractors at those other facilities as well.  (*Id.*)

### D.  Plaintiff now has met the lenient standard to certify a conditional class

With his renewed motion, affidavits, and exhibits, the Court finds that Plaintiff has met the lenient standard for condition class certification.  The Court will therefore conditionally certify a class; but the Court limits the class to the White House, Michigan independent contractors, for Plaintiff has not provided an affidavit or any evidence showing that there were similarly situated independent contractors in Defendant's other locations.

Plaintiff argues that now the affidavits do more than what they did before.  (Pl.'s 2d Mot. at 10.)  Plaintiff maintains that he has offered evidence that he more than simply "believes" other independent contractors subject to Defendant's practices exists; he now

18

states that he and the other affiants have established that they have personal knowledge about the overtime and classification of independent contractors. (*Id.*)

In its second response, Defendant points out inconsistencies with Plaintiff's affidavits and the other affidavits. Defendant also offers its own affidavits to refute Plaintiff's offered assertions. And Defendant even goes so far as to allege that Plaintiff himself rarely worked five days per week. Because of these inconsistencies and factual differences, Defendant maintains that Plaintiff is not entitled to conditional class certification.

The Court agrees with Plaintiff. Given the additional affidavits, and because the Court does not resolve factual disputes on a motion for conditional certification, the Court finds that Plaintiff has met his burden. Plaintiff has produced evidence that Defendant scheduled those people whom it called independent contractors for over forty hours of work per week without paying them overtime. The Court notes that that class is a general one, where Defendant is arguing for a more specific class.[3] But the Court finds that Defendant's arguments are more suited for the second stage of conditional certification. *See Pacheco v. Board's Head Provisions Co., Inc.*, 671 F.Supp.2d 957 (W.D.Mich. 2009) (citation omitted) ("The standard applied at the second stage considers a variety of factors, including the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action.").

---

[3]Defendant, in its second response, offers that Plaintiff, Wardell, and Cook differ with respect to: pay; job duties; chargebacks; use of equipment; types of jobs assigned; cable companies for whom work is performed; clothing worn on the job; vehicles used on the job; Amcomm offices to which the contractors report, and even whether they report; and frequency and days worked. (Def.'s 2d Resp. at 5.)

Plaintiff points to *Lee v. Gab Telecom, Inc.*, 12-14104, 2013 WL 1632552 (E.D.Mich. Apr. 16, 2013) (Drain, J.), a case brought by Plaintiff's counsel in another court in this district. There, the court granted the plaintiff's request for conditional certification. *Id.* at *1. The facts and claims are similar to this case's facts and claims. There, four plaintiffs, cable installation technicians, alleged that the defendant cable company violated the FLSA by not paying the plaintiffs time-and-a-half when they worked more than forty hours per week. *Id.* The court noted that the defendant cable company paid the technicians on a per-job basis. *Id.* The court also noted that the defendant had originally classified the technicians as independent contractors, but then classified them as employees. *Id.* In support of conditional certification, the plaintiffs stated that they had personal knowledge of the defendant's treatment of other technicians by: (1) observing other technicians' assignments; (2) speaking with other technicians about the amount of hours they worked; (3) attending staff meetings where the defendant's owner and manager discussed compensation for technicians in general terms; and (4) observing other technician's' billing statements. (*Id.*)

The *Gab* court held that the plaintiffs alleged that they were similarly situated in the following ways: they worked exclusively for the defendant as cable installation technicians; (2) they were paid a flat rate for each installation they completed; (3) the defendant misclassified them as independent contractors; and (4) they worked over forty hours per week without receiving overtime pay. 2013 WL 1632552, at *2.

The *Gab* court distinguished this Court's first order denying Plaintiff's motion for conditional certification. 2013 WL 1632552, at *3. The court stated that the plaintiffs "alleged personal knowledge of the characteristics shared with the putative class." *Id.* And

20

the court noted how the plaintiffs alleged a plausible account of how they acquired personal knowledge that the other technicians worked more than forty hours per week.  *Id.*  The court found this information, along with the plaintiffs' supplemental affidavits, was sufficient for conditional class certification.  *Id.* at *4.

The Court finds that *Gab* is analogous and illustrative.

Here, as in *Gab*, the Court is not addressing this case's merits, the Court only looks to the affidavits to see if Plaintiff has made sufficient allegations and a modest factual showing.  Plaintiff has done so.

Defendant argues that the Court must impose a more rigid standard in evaluating the affidavits that Plaintiff has submitted since the Court has afforded Plaintiff the ability to conduct limited discovery.  (Def.'s 2d Resp. at 14.)  Defendant argues that it has pointed out inconsistencies in Plaintiff's offered affidavits and that the Court must discredit the affidavits and rule that there is not a similarly situated class. (*Id.*)  *See Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F.Supp.2d 957, 965 (W.D.Mich. 2009) (finding that the plaintiffs failed to meet the modest burden in proving that the potential opt-ins were similarly situated because the plaintiffs' affidavits and deposition testimony contradicted each other.).  Here, though, unlike in *Pacheco*, Defendant did not examine Plaintiff and the potential opt-ins, Defendant is mostly pointing to inconsistencies between the different affidavits.  That difference, the Court finds, is enough to remove this case from *Pacheco*'s reasoning and holding.

Defendant also argues that the fact that Plaintiff has not offered more affidavits from other individuals "is clear evidence that none [of the individuals] wish to participate and there is no reason to certify this as a collective action."  (Def.'s 2d Resp. at 9.)  But Plaintiff

need not provide evidence that other employees wish to opt in before the Court conditionally certifies a collective class.  *See Shipes v. Amurcon Corp.*, 10-14943, 2012 WL 995362, at *8-9 (E.D.Mich. Mar. 23, 2012) (Roberts, J.) (collecting cases and stating, "the Sixth Circuit has never required evidence that others will opt in before the certification decision can be made. Instead it recognizes the 'broad remedial goals' of the FLSA . . . which would be undermined by a requirement that [a plaintiff] produce evidence that other employees wish to join the class before notice is sent to putative plaintiffs.").

Plaintiff has met the lenient standard for conditional certification.

## IV.   Conclusion

For the above-stated reasons, the Court GRANTS in PART Plaintiff's motion. The Court conditionally certifies the following class:

> All persons who, at any time since September 17, 2009 (1) have worked as cable installation technicians for AMcomm Telecommunications, Inc.out of the White Lake, Michigan warehouse; (2) have been classified as "independent contractors"; and (3) have not been paid time and a half for hours worked over forty in a workweek.

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 23, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2013, by electronic and/or ordinary mail.


s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer