UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Robert Swinney et al.,

        Plaintiffs,

v.

AMcomm Telecommunications, Inc.,

        Defendant.

_____/

Case No. 12-12925

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [99], HOLDING PLAINTIFF'S MOTION TO CERTIFY RULE 23 CLASS
ACTION IN ABEYANCE [101], DENYING PLAINTIFFS' MOTION FOR PROTECTIVE
ORDER AND TO STAY DISCOVERY [112], AND SETTING DISCOVERY AND
BENCH TRIAL DATES**

      Plaintiffs have filed a Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*,

claim against their employer Defendant AMcomm Telecommunications, Inc., alleging that

Defendant misclassified them as "independent contractors," when they were performing the

same work as Defendant's employees, and therefore entitled to overtime pay and other

benefits.[1]  (Dkt. 1, Compl.)   Plaintiffs also assert a claim for unjust enrichment against

Defendant for the work they performed for Defendant for which they allege they were not

properly compensated.

      Two motions are before the Court.

---

   [1]Defendant is a telecommunications company involved in telephone and cable and
internet installation.  Defendant states that its employees perform 80% of the work involved
with the company's business.  It further states that it utilizes independent contractors for
overflow work and that these independent contractors "sign independent contractor
agreements [that] specifically set forth the nature of the relationship as that of an
independent contractor as opposed to an employee."  (Def.'s Resp. at 1.)

Defendant has filed a motion for summary judgment on the employee/independent contractor issue. (Dkt. 99.) Defendant argues that no issue of material fact exists that Plaintiffs were independent contractors.

Because the Court finds, after analyzing this case's facts under the economics realities test, that genuine issues of fact exist as to the employee-independent contractor issue, the Court denies Defendant's motion for summary judgment and sets the issue for a bench trial.

Plaintiffs have filed a motion requesting that the Court certify a class action as to the second count in their complaint, a claim for unjust enrichment. (Dkt. 101.) Plaintiffs argue that they have unjustly enriched Defendant through its use of chargebacks on its cable technicians. As the Court stated at the hearing, it holds this motion in abeyance in the interests of justice. The Court will revisit the motion after the bench trial on the independent contractor/employee issue.

## I.   Facts

The Court and parties are familiar with the premises of the case. The Court will therefore only present the facts as required in the analysis section.

## II.   Summary Judgment Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the

2

non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Defendant's motion for summary judgment

This Court must determine if a genuine issue of material fact exists on the question whether Plaintiffs were Defendant's employees, as contemplated by the FLSA, as opposed to independent contractors, which would outside the FLSA's scope and protections. Applying the relevant law and considering the evidence presented in the light most favorable to Plaintiffs, the Court finds that there are genuine issues of fact as to this issue. The Court therefore will conduct a bench trial to determine the issues and weigh the evidence.

It is well-established that "[t]he requirements of the FLSA apply only to employees," and "courts must determine whether, as a matter of economic reality, an individual is an employee or an independent contractor in business for himself." *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 782-83 (11th Cir. 2006) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)). *See also Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) (observing that "employees are those who as a matter of economic reality are

3

dependent upon the business to which they render service").  And, as the Sixth Circuit has observed, "the determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law."  *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984); *accord Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994).

The Sixth Circuit, as well as every other federal court that has considered this issue under similar circumstances, examines six factors to determine the economic reality of the working relationship presented in the case before it.  *See, e.g., Donovan*, 736 at 1117, 1117 n.5; *Freund*, 185 F. App'x at 783; *Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F. App'x 104, 105-06 (4th Cir. 2001); *Bennett v. Unitek Global Servs., LLC*, No. 10 C 4968, 2013 WL 4804841, at *5 (N.D. Ill. Sept. 9, 2013) (observing that "the Seventh Circuit instructs courts to consider" these same six factors).  Likewise, it is well-established that "none of the six factors is dispositive and instead the totality of the factors and circumstances control."  *Bennett*, 2013 WL 4804841 at *5 (citing *Bartels v. Birmingham*, 322 U.S. 126, 130 (1947)); *Scruggs v. Skylink Ltd.*, No. 3:10-0789, 2011 WL 6026152, *2 n.2 (S.D. W. Va. Dec. 2, 2011) (observing that these six factors "derive from the Supreme Court's decision in *United States v. Silk*, 331 U.S. 704 (1947) ).  *See also Donovan*, 736 at 1116 (observing that "[t]he issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.").  The six factors to be considered are:  "1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill;" "5) the degree of the alleged employer's right to control the manner in which work is performed;" and 6) "whether

4

the service rendered is an integral part of the alleged employer's business." *Id.* at 1117, 1117 n.5.

Because the question whether a plaintiff is an employee or an independent contractor is a question of law, summary judgment is appropriate "[p]rovided there are no disputes of material historical facts." *Scruggs*, 2011 WL 6026152 at *2. As discussed below in the Court's discussion of the relevant six-factors, material factual disputes exist, warranting the Court's denial of Defendant's motion. The Court notes that Plaintiffs have not filed their own motion on the employee-independent contractor issue, but argue that they are entitled to summary judgment in their response. Even if the Court were to find that request procedurally proper, the Court finds that issues of material fact exist on both sides that would warrant the denial of summary judgment on cross motions.

In deciding, the Court looks to the depositions of the three lead, or prior lead, plaintiffs–Swinney, Cook, and Wardell, as well as the newly-submitted affidavits of Donald Moore, Joseph Lance, and Theodius Cross. The Court also notes the depositions of Defendant's managers, Mike Smith and Matt Schultz.

### 1. Degree of permanency in working relationship

The first factor considered "focuses on the substance and permanence of the working relationship between a putative employer and the worker." *Id.* at *7. The "more permanent the relationship" and the "greater exclusivity" of that relationship, the more likely the plaintiff is an "employee" falling within the scope of the FLSA. *Id.*

The facts here, in a light most favorable to Plaintiffs, support finding a question of material fact. Swinney testified that he worked for a year and four months and that he heard he could not work for another company while working for Defendant. (Swinney Dep.

5

at 31, 155.)  Cook worked for Defendant for eight years, with a two year break after the first three years.  (Cook Dep. at 19.)  Cook stated that he did not know whether he could work for another company.  (*Id.* at 88.)  Wardell began working for Defendant in 2009 and worked for it until the start of this lawsuit.  (*Id.* at 33.)  The submitted affidavits also support a long-term, exclusive relationship.  Moore stated that he worked for two years and that Defendant prohibited him from work for other companies.  (Moore Aff. ¶¶ 1, 18.)  Lance stated that he worked for three or four years and that it was not possible to work for other companies and that Defendant prohibited it, even if such work were possible.  (Lance Aff. ¶¶ 1, 22, 23.)  Cross stated that he worked for four years and that Mike Schultz told him that he could not perform cable installation work for any other companies.  (Cross Aff. ¶¶ 1, 15.)

Evidence against Plaintiffs' evidence exists.  Smith stated that a contractor could work for another company while working for Defendant.  (Smith Dep. at 53.)  Defendant has also submitted the affidavit of Brad Bechtel, a current independent contractor, who indicates that during his time working for Defendant he also worked for Auro Communications and K and D Communications.  (Def.'s Mot., Ex. O.)  Brad Smith testified that he worked in the lighting and the camera fields while working as an independent contractor for Defendant.  (*Id.*)  Michael Tillman stated that no one from Defendant told him that he could not work for other cable installation companies; he stated that Defendant only told him that he could not use supplies received from it on jobs for other companies.  (*Id.*)

Viewing the facts in the light most favorable to Plaintiffs, this factor favors viewing Plaintiffs as employees, rather than independent contractors.  While it is true that Plaintiffs signed independent contractor agreements that expressly list the rights and responsibilities

6

of each party and specifically define the relationship as one of independent contractor and employer, the relationship's permanency gives another view.  Plaintiffs each testified that they had a long and arguably exclusive relationship with Defendant.  This testimony weighs in favor of a finding that Plaintiffs were employees.  *See Solis v. Cascom, Inc.*, 09--257, 2011 WL 10501391, at*6 (S.D. Ohio Sept. 21, 2011) (finding that the employer's hiring of the technicians for an "indefinite period" and the fact that most contractors worked for over a year and a half and until they quit or were fired (akin to an at-will relationship) favored an employee finding.).  The Court further notes that the independent contractor agreement contains a non-compete agreement, which in and of itself weighs in favor of viewing Plaintiffs as employees.  *See Harris v. Skokie Maid and Cleaning Serv., Ltd.*, 11-8688, 2013 WL 3506149, at *9 (N.D.Ill. July 11, 2013) (noting an unpublished Third Circuit case holding that an employer could not enforce a non-compete agreement against an independent contractor, in part, because the non-compete treated the contractor like an employee.) (And holding that the non-compete provision weighed in favor of considering the plaintiff maids as employees rather than independent contractors.) (citation omitted).  Given the technicians' relationship with Defendant–the long-term duration and the testimony of exclusivity, the Court finds that a material issue of historical fact exists as to this factor.[2]

---

[2]The Court notes that contradictory testimony exists, e.g., Cook stated that he took the first two summers off because he did not want to work, the other Plaintiffs spent a variable amount of time developing their music careers, Defendant's offered testimony of non-exclusivity, the Court is to view all reasonable inferences in Plaintiffs' favor.  Here, the Court finds that the facts as Plaintiffs present are plausible and will credit them at the summary judgment stage.  *See Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F.Supp.2d 667 (D.Md. 2000), *aff'd sub nom. Chao v. Mid-Atlantic Installations Servs., Inc.*, 16 F.App'x 104 (4th Cir. 2001) (determining this factor weighed in neither party's favor since the court

7

### 2.  Degree of skill required for services

"A finding of unique or distinctive skills weighs in favor of independent contractor status." *Bennett*, 2013 WL 4804841 at *9.  A number of courts have considered this factor in cases involving satellite or cable installers and have concluded that installers like Plaintiffs have "special skills" that allow them to properly install, repair, and explain to customers how their satellite or cable systems operate.  *See, e.g., Freund*, 185 F. App'x at 784; *Chao*, 16 F. App'x at 107; *Herman*, 164 F.Supp.2d at 675 ("[T]here is no question that [cable installation] is a skilled trade" . . . "skills involved in cable installation and service are akin to carpentry and electrical work," which traditionally have received independent contractor status."); *Santelices v. Cable Wiring, Inc.*, 147 F. Supp. 2d 1313, 1320 (S.D. Fla. 2001) (observing that "a cable installer in today's market is considered a skilled tradesman"); *Bennett*, 2013 WL 4804841 at **9-10 (observing that the "skills of cable installers are akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors"); *Scruggs*, 2011 WL 6026152 at *7 (same).

---

found that some technicians worked for over one year, while others did not.)  The court discussed how the technicians could make a career of working for the defendant, but that they did not have to, therefore warranting a neutral finding as to this factor.  *Id.*  The court also discussed the parties' arguments as to whether a technician could work for more than one contractors.  *Id.* at 676.  The court reasoned that there was evidence that the defendant discouraged working for another cable installation service, but the court further noted that very little time and no incentive existed for the technician to work for another company.  *Id.*  The court held that the defendant gave full job loads to the technicians, so "there was no reason to switch from one broker to another or to work for more than one at any given time."  While the court noted that the defendant's discouragement of working for another company "contributed to a more permanent working relationship between [the defendant] and the [technicians], and otherwise generally strengthened the economic dependence . . . it is not enough, by itself or in combination with other factors, to cause the [technicians] to be classified as [the defendant's] 'employees.'" *Id.* at 676-77.

8

But not all courts have found that this factor automatically and so greatly weighs in the cable installation company's favor, though.   In *Scantland*, 721 F.3d at 1318, the court reasoned that cable installation was a special skill, favoring contractor status, but that some technicians came to the defendant "completely inexperienced" and learned the skill through "unpaid ride-alongs."   *Id.*   The court stated that the technicians were dependent upon the defendant "to equip them with the skills necessary to do their jobs."   *Id.*   That dependence, the court held, weakened the normal strong weight given to this factor and its tendency to favor independent contractor status.   *Id.*

Here, as in *Scantland*, some of the plaintiffs have testified that they came to Defendant with no installation skills and learned the trade on the job, weakening the finding that this factor weighs so heavily in Defendant's favor.   Swinney testified that he learned the trade from Wardell, who also had no experience when he started working for Defendant and learned the trade from Cook.[3]   (Swinney Dep. at 15, Wardell Dep. at 26.)   Swinney described that he trained for two weeks with Wardell.   (Swinney Dep. at 66.)   He stated that he rode along with Cook for a few days as well.   (*Id.*)   He added that he trained with one of Defendant's supervisor's, Kevin Goff, who expressly told him how to disconnect cable and install the cable.   (*Id.* at 67.)   He explained that he rode with Goff because he was having a hard time learning about internet installation.   (*Id.* at 68.)   Wardell explained that he rode along with Cook to learn how to do the cable installation jobs.   (Wardell Dep. at 45.)

---

[3]Swinney stated in his deposition that, before he worked for Defendant, he had some experience disconnecting cable.   (Swinney Dep. at 57.)   He explained that he did not officially work for a company, but that he worked for a friend who needed help.   (*Id.* at 58.)   The Court points out that this testimony contradicts his statement that he had no experience, as indicated above.

He said that he rode along for a few weeks to a month, until he felt confident enough to ask to be on his own. (*Id.*) He stated that he did not learn everything he needed to learn from Cook, but he did state that he learned the principles from him. (*Id.*) Wardell added he taught himself everything else, although Defendant "periodically" gave him literature on how to perform different jobs. (*Id.* at 46-47.) And he stated that he had conversations with Goff and Mike Smith, Defendant's operations manager, about how he should be doing his job. (*Id.* at 50-53.) Wardell maintained that he knew that he had the exact same training as the employees had. (*Id.* at 75.) Cross also has indicated that Defendant hired him with no experience doing cable installation and repair work. (Cross Aff. ¶ 3.) He added that Defendant required him to go through training, which entailed riding along with a more experienced cable technician for a few weeks "in order to learn every type of cable installation and repair job [Defendant] would expect him to perform." (*Id.* ¶ 6.)

Matt Schultz, Defendant's president and founder, testified that he did not train the independent contractors. (Schultz Dep. at 91.) Schultz explained that he could not take independent contractors under his wing and have the contractor ride with a supervisor and teach the contractor, as he had employees do. (*Id.* at 107.) Schultz added that he did not think he could provide training to his independent contractor. (*Id.* at 111.) He did state, though, that he provided them with literature and written products from the cable company that addressed how the cable company expected a technician to complete a job. (*Id.* at 111-12.) Scultz also stated that some contractors had asked to attend training sessions and that he may have allowed their attendance. (*Id.* at 112.) He admitted that he may have asked a contractor to attend a training for certain segments of the training. (*Id.*) He

10

explained, though, that the contractors had signed the independent contractor contract, in which they stated that they could leave any training session that they did think was relevant to him.  (*Id.* at 112-13.)

Mike Smith also testified that Defendant never required the independent contractors to attend any meetings.  (Smith Dep. at 21.)  He added that the independent contractors learned of changes through literature that Defendant provided them.  (*Id.*)

The Court finds, as the *Scantland* court found, that differences exist between the facts presented here and the facts as presented in the majority of cases that have addressed the economic realities' skill factor.  The Court agrees with the majority of courts that cable installation and repair is normally and primarily a skilled trade.  But the Court finds that the weight of this factor does not favor Defendant so greatly.  Here, Plaintiffs testified that they had no training when Defendant hired them and that Defendant, in some instances, provided them with the skills they needed to be a cable technician.  This providing and accepting of unskilled workers favors the Court viewing Plaintiffs as employees, at least when viewing the facts in a light most favorable to Plaintiffs.  Disputes of fact exist as to this factor.

### 3.  Worker's capital investment in equipment/materials/tools

The more a cable technician invests in the trade, the more likely a court is to view that technician as an independent contractor and not a employee.  *See Scruggs*, 2011 WL 6026152 at *6 (finding that, when it was undisputed that the plaintiff/installer was "responsible for providing [his] own work equipment and vehicles," this was "a compelling indication" that the plaintiff was not an employee).  *See also Freuna*, 185 F. App'x at 783-84; *Chao*, 16 F. App'x at 107; *Bennett*, 2013 WL 4804841 at *9 (observing that the

plaintiff/installers "were required to procure their own insurance and have their own vehicles and ladders for the installation services" and finding that "these facts [were] indicative of at least some 'economic independence'").  Here, while there is testimony that Plaintiffs had to provide their own equipment such as hammers and drills, indicating an independent contractor status, testimony also exists that Plaintiffs did not have to have any speciality equipment because they could rent it from Defendant.  Testimony also exists that Defendant leased cars to any cable technician whose car did not meet Defendant's standards.

Swinney stated that he had his own hammer and drill.  (Swinney Dep. at 72-73.)  But he added that he often borrowed equipment from Defendant and other workers.  (*Id.*)  Swinney also rented one of Defendant's trucks, because Defendant would not allow him to use his own truck, because his truck was not white.  (*Id.* at 70-71.)  Swinney stated that some workers used their own cars, while others used Defendant's.  (*Id.* at 72.)  Cook stated that he sometimes used his car and sometimes rented one of Defendant's trucks.  (Cook Dep. at 34-35.)  For a cable technician to use his own car, Cook stated, Defendant had to approve it.  (*Id.*)  Cook stated that he primarily had his own tools for assignments, but he had to rent some specialized equipment from Defendant.  (*Id.* at 58-59.)  Wardell explained how Defendant's car policy changed as he approached the end of his time with Defendant.  (Wardell Dep. at 85.)   Wardell stated that Defendant was looking to implement a requirement that all vehicles that contractors used had to be white and had to be less than five years old.  (*Id.*)

The Court finds that this factor, as it traditionally does, weighs in favor of a finding of an independent contractor.  But the Court does find that the reality of Defendant and

Plaintiffs' relationship undercuts the weight the Court assigns to this factor. Here, while Plaintiffs testified that they had the main tools necessary to perform cable installation, drill and hammer, Plaintiffs also testified that they were able to rent any equipment they need, including specialized equipment, from Defendant, which would deduct the rental amounts from their paycheck. The rental scheme undercuts a strong finding that this factor favors an independent contractor holding. *See Scantland*, 721 F.3d at 1317-18 (finding that the cable technicians did not have a significant need of independent capital, since they could 'finance' the items they needed to perform their duties directly from the defendant, which would then deduct those items' costs from the technicians' paycheck. The court reasoned that the financing option detracted little from the technicians' economic dependence on the defendant.). *See also Herman*, 164 F.Supp.2d at 675 (noting that the investment factor favors an independent contractor finding because the cable technicians were required to have equipment, including speciality equipment, they had to provide their own truck or van, and they had to pay their own insurance premiums, and taxes.). Here, the fact that Defendant put standards on the type of vehicle that the technicians drove also undercuts the weight given to this factor. Defendant required Plaintiffs to drive a car that was substantially similar to the company vehicle, if the technicians were to drive their own car at all. Otherwise, Defendant offered technicians the ability to rent a vehicle from Defendant. This rental scheme, again, like the equipment rental scheme, undercuts the traditional finding of an independent contractor given the investment factor.

### 4. Degree of alleged employer's right to control manner of work performed

Under this factor of the "economic reality" test, the Court examines the nature of the working relationship and determines whether the alleged employer's degree of control over

13

the "manner and method" of the installer's work performance "tends to indicate that the individual was an employee under the 'control' of the employer." *Bennett*, 2013 WL 4804841 at *6. "Courts, in evaluating this factor, have considered such details as whether workers may choose how much and when to work, . . . whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." *Scruggs*, 2011 WL 6026152 at *3 (internal quotation marks and citation omitted).

Here, the Court finds that Plaintiffs have offered sufficient evidence to suggest that Defendant had significant control over them and their days, necessitating favoring the employee status. Plaintiffs have brought forth evidence that Defendant had significant control over Plaintiffs' arrival times and uniforms. Evidence also exists that Plaintiffs did not have the ability to negotiate their pay. Plaintiffs have also created a fact as to whether meetings were mandatory. And, most tellingly, Plaintiffs have brought forth evidence that Defendant exercised substantial control over their days and that Defendant used the chargebacks system not only as a quality control measure, but also to punish Plaintiffs for nomcompliance with Defendant's 'rules', e.g. arrival time, meetings, etc. The Court notes that, while the groups of evidence that the Court discusses below may not be sufficient, on their own, to favor an employee status finding, the Court finds that, viewing all the evidence together, and in a light most favorable to Plaintiffs, that there are material issues of fact as to the amount of control Defendant exercised over Plaintiffs.

<u>Arrival time</u>

All of the plaintiffs have stated that they were required to be at the warehouse between seven and eight a.m. in order to receive work. The punctuality alone, though, would not lead to the Court to finding Defendant exercising a significant amount of control.

14

But the fact that testimony exists that Defendant began to penalize Plaintiffs for tardiness does indicate a greater amount of control.

Cook stated that he had to report to Defendant's warehouse at a specific time, between seven and eight a.m. each day and that Defendant required him to work a mandatory six days per week.  (Cook Dep. at 21, 46.)  Swinney testified that, as he continued working for Defendant, the rules became stricter about arrival time.  (Swinney Dep. at 44.)  He stated Defendant started docking/charging the technicians if they did not arrive at the warehouse by seven a.m.  (*Id.*)

Swinney stated that he felt that, if he did not go in to work, that he would end up not having a job.  (Swinney Dep. at 37-38.)  After the first seven or eight months, Swinney stated that he would be in contact with his supervisor, Goff, about whether there were jobs for Swinney the next day.  (*Id.* at 38-39.)  Swinney stated that he was not allowed to choose which days he could work.  (*Id.* at 41.)  He stated that he received the impression that he had to let his supervisor know whether he was not going to come in the next day.  (*Id.* at 42.)

Mike Smith, again, Defendant's owner, stated that, if a contractor wanted work, he had better arrive at the warehouse by seven thirty a.m.  (Smith Dep. at 35.)

Uniforms

Testimony exists that the Defendant's uniform was mandatory.  (Swinney Dep. at 73; Cook Dep. at 31.)  Moore stated that Defendant required him to wear its uniform.  (Moore Aff. ¶ 5.)   Failure to wear the uniform, he stated, resulted in Defendant backcharging/penalizing him.  (*Id.* ¶ 6.)  In addition to echoing similar statements about Defendant's uniform policy, Lance added that Defendant controlled the color of jeans that

15

he had to wear.  (Lance Aff. ¶ 11.)  Cross  stated that, even though Defendant required him

to form his own business, Defendant prohibited him from wearing any hats or shirts that

identified his own business.  (Cross Aff. ¶ 16.)

Smith stated that the contractors were not required to wear Defendant's uniform.

(Smith Dep. at 33.)

A disputed issue exists as to whether Defendant required or did not require Plaintiffs

to wear.  While requiring a uniform does not necessitate in an automatic finding of an

employee status, an issue exists as to what happened when a technician did not wear a

uniform.  If a penalty other than not receiving work that day resulted from failure to comply

with a uniform policy, the Court would view that action as having more control over cable

technicians, and a finding of an employee status.  *See Herman*, 164 F.Supp.2d at 673

(stating that requiring independent contractors' to wear uniforms and badges did not affect

the economic reality of their relationship with the defendant, but merely allowed the

customers to be assured of the technician's identity.).

Inability to negotiate pay

A cable technician's ability to negotiate his pay indicates an independent contractor

relationship.  Here, Plaintiffs have testified that they were not able to negotiate their own

pay and that the pay was offered on a take-it-or-leave-it basis.  (Cook Dep. at 31; Wardell

Dep. at 98-99; Moore Aff. ¶ 17.)

Defendant and their managers represent that the cable technicians could negotiate

their pay.

Again, an issue of fact exists as to this element of the control factor.

Mandatory meetings

16

An issue of fact again exists as to whether Defendant required Plaintiffs and other cable 'independent contractors' to attend training/information meetings. Plaintiffs stated Defendant required them to attend meetings, and that failure to do so would result in a backcharge/penalty; Defendant represents that it may have 'offered' the meetings to Plaintiffs, but never required them. Defendant additionally represents that the independent contractor contract that Plaintiffs all signed contained a clause that stated that any independent contractor could attend, but could leave at any time if they felt that the meeting was not relevant to them.

Swinney stated that the meetings were required. (Swinney Dep. at 124.) Swinney explained that his supervisor told him about the meetings. (*Id.*) Swinney further explained that the meetings involved updates on company procedures and policies and were necessary to keep everyone on the same page. (*Id.*) Swinney stated that he did not know whether Defendant took attendance or required him to sign any paper to record his presence. (*Id.* at 125.)

Cook also stated that the meetings were mandatory. (Cook's Dep. at 93.) He said that some of the meetings were mandatory. (*Id.* at 95.) He further testified, that if a technician did not attend the meeting, Defendant would backcharge an amount or suspend the technician, meaning that Defendant would not assign the absent technician any work. (*Id.*)

Moore further explained Defendant's actions during the meetings–he said that during the mandatory weekly meetings, Defendant would regularly threaten to fire him and the contractors if they failed to show up at work at seven a.m. or if they did not wear the correct uniform. (Moore Aff. ¶ 7.)

17

Defendant says that the meetings were not mandatory.

An issue of fact again exists. Because the Court is required to view the facts in a light most favorable to Plaintiffs, the Court finds that this element weighs in favor of an employee status. If Defendant compelled the meetings, threatened termination, and backcharged for absences, the Court would be more inclined to find that Plaintiffs and Defendant had an employee-employer relationship.

<u>Control over the day</u>

The Court finds that the most significant evidence that Plaintiffs have presented as to control is that evidence that shows how much control Defendant had over Plaintiffs in their day-to-day operations. Plaintiffs have presented evidence that Defendant assigned cable jobs on a take-it-or-leave-it basis–regarding payment for the jobs, geographical areas, and time ranges for completing the job–did not allow technicians, generally, to pick the jobs they wanted or to rearrange their schedules, mandated a six and sometimes seven-day workweek, checked on them throughout the day, required them to check in, required them to receive a "clear code" before they left for the day, required them to stay in various geographical areas in case a customer in that area may need cable services (without paying them), required them to complete jobs that Defendant added on during the day or assist another technician in the area, and used backcharges as a punishment and not solely to ensure quality. Defendant contests or attempts to reframe all of the allegations. Given Plaintiffs' testimony, the Court find that an issue of historical fact exists as to this element of the control factor, necessitating summary judgment denial.

Moore stated that, in the mornings at the warehouse, Defendant would tell him the work he would perform during the day; Moore related that he could not reject the

18

assignment, because if he did, he would not receive any work at all.  (Moore Aff. ¶ 8.)

Moore also stated that Defendant told him the times he was supposed to perform the

assigned jobs, and that he did not have the flexibility to rearrange the jobs to better suit his

preferences.  (Id. ¶ 10.)  Moore added that he could not refuse any work from Defendant.[4]

(Id. ¶ 19.)

Wardell stated that Defendant regularly exercised its authority to require technicians

to work up to six or seven days each week.[5]  (Wardell Dep. at 91, 93-94.)  Cook testified

that there were times during the summer when Defendant told all the technicians that

working six days per week was mandatory.  (Cook Dep. at 107.)  Cook stated that, when

he started with Defendant, he worked six days per week, primarily from 2008-2011.  (Id.

at 42.)  But Cook acknowledged that he took seven months off in 2011, for an injury, which

was his choice entirely.  (Id.)  He added that Defendant did not have a problem with him

working only three or four days per week when he returned.  (Id. at 42-43.)  Cook also

stated that he took two summers off when he worked for Defendant, simply because he did

not want to work.  (Id. at 68.)  He characterized the time off as him quitting and then getting

rehired.  (Id.)  He added that he had to let Defendant know two weeks in advance, if he

---

[4]Some contradictory testimony exists.  Swinney acknowledged that he only did the most
basic of cable jobs–installing and uninstalling cable.  (Swinney Dep. at 102.)  The Court
suspects that Swinney did not have the skill and/or training to do other jobs.  Cook, though,
stated that there was a contractor who did not like to do phone work and that Defendant
honored that required and allowed him to not work on any job that required phone work.
(Cook Dep. at 81.)  There is no explanation as to why this worker was allowed this
concession.

[5]Wardell agreed, though, that different workers worked a different amount of days.
(Wardell Dep. at 97-98.)  Wardell also said that he took a vacation once, but he added that
he never just woke up one day and did not go into the office because he did not feel like
going to it.  (Id. at 94.)

19

wanted to take time off.  (*Id.* at 69.)

Swinney stated that Defendant required him to record the time he started and ended a job on his PDA.  (Swinney Dep. at 95.)  Swinney also stated that Defendant's call center would call him and check on him during the day to see whether he was still working.  (*Id.* at 97.)  Swinney did state, though, that he did not need to contact Defendant during the day unless he had a problem with an assignment.  (Swinney Dep. at 148.)  He added that he could leave, so long as he did what he needed to do on his PDA.  (*Id.* at 149.)

Cook echoed that he had to indicate that he finished a job on his cell phone so that Defendant would know when he finished a job.  (Cook Dep. at 45.)  Cook testified that, at various times while working for Defendant, he had to comply with various 'check-in' procedures.  (*Id.* at 85.)  At times, Cook said that he had to check in with Defendant after he finished each assignment.  (*Id.*)  At other times, towards the end of his time with Defendant, he just had to call in at the end of the day to get an "end-of-day" code so that he could get confirmation that it was okay to go home.  (*Id.*)

Moore stated that, after he finished a job, Defendant required him to call one of Defendant's dispatchers to get a "clear code."  (Moore Aff. ¶ 12.)  Only after receiving this code, Moore stated, did Defendant allow Moore to move on to his next assignment.  (*Id.*)  Failure to receive a clear code for an assignment resulted in a backcharge.  (*Id.* ¶ 13.)  Moore added that Defendant "made it clear that [he] could be fired for failing to get a clear code."  (*Id.*)  Moore said that, at times, the backcharge for failing to get a code was more than Defendant paid him for a job, so he would actually owe money to Defendant.  (*Id.* ¶ 14.)

Several times a week, Moore related, Defendant required that Moore stay in his truck

in the area he was servicing to see if any of Defendant's customers would need him for the five to seven p.m. time slot. (Moore Aff. ¶ 15.) Moore added that Defendant did not pay him for these jobs. (*Id.*)

Cook testified that he would sometimes assist other technicians who were on assignments. (Cook Dep. at 61.) He said that Goff or another supervisor, would call him and ask him to assist the other technician in the field. (*Id.* at 60.) Cook also testified that he sometimes traded jobs with other technicians, although he did not know whether Defendant permitted the trading. (*Id.* at 70.)

Cook stated that, during down times in the day, he would either sit in his van, or if he were close to home, he would go home and eat something. (Cook Dep. at 64.) Cook maintained that he was working during those down times because Defendant required him to remain logged into his phone. (*Id.* at 65.) Cook explained that Defendant could add an assignment for him to do at anytime and that he would have to do it. (*Id.*)

Cook stated that Defendant would backcharge the technicians if they failed to show up for work one day and did not call in and let Defendant know they were not coming. (Cook Dep. at 110.) Wardell echoed Cook's statement. (Wardell Dep. at 93.) Wardell said that his supervisor would threaten workers that, if they did not arrive at the warehouse in time to meet their first timeframe, that Defendant would backcharge them. (*Id.*)

Moore said that Defendant's managers and quality control personnel "frequently inspected" his work after he completed an assignment. (Moore Aff. ¶ 16.) Moore stated that he knew so because Defendant's supervisors would often report that he failed to complete a portion of the assignment properly. (*Id.*) Moore explained that there was no way for him to contest failure or the backcharge and that, even if the mistake was minor,

Defendant would backcharge him.  (*Id.*)

Cook also stated that he was not able to subcontract his work.  (Cook Dep. at 111.)

Schultz testified that a technician could choose how to complete a job so long as the end result was of the quality the cable company expected. (Schultz Dep. at 116-17.) Schultz stated that he did not track the contractors' hours, because he paid them by the job, and not by the hour.  (*Id.* at 122.)  He acknowledged that Defendant used a GPS tracking system on its trucks to identify where technicians were so that it could meet its clients' adjusting needs. (*Id.* at 133.)  But he explained that not all of Defendant's trucks were GPS-equipped and that those that were not equipped, he leased to employees first. (*Id.*)

Smith testified that contractors worked when they wanted to work; he said that he did not force the contractors to do anything.  (Smith Dep. at 18.)

Smith stated that the contractors had the ability to vary their routes and move the time frames.  (Smith Dep. at 34.)  Smith clarified , though, by stating, if a technician wanted to do a six a.m. job at two p.m., he would not have allowed that, and he would have taken back the job and assigned it to an in-house employee.  (*Id.*)

Smith testified that he knew some contractors would be at the warehouse every day, because they were "hungry" for work.  (Smith Dep. at 62.)  Smith also testified that he would try to keep the contractors busy for an entire day, if at all possible." (*Id.* at 63.)

Smith testified that he tried to keep the technicians in the same geographical area so they were not inefficiently driving to various places.  (Smith Dep. at 79.)

Smith testified that a clear code occurred when the cable technician called into the call center to get approved for the end of a job.  (Smith Dep. at 113.)

22

Courts have found that the general factors outlined above do not automatically evidence an amount of control over an independent contractor that necessitates an employee finding. *See Freund*, 185 F.App'x at 782-83 (finding that the control factor weighed in favor of an independent contractor finding. The court noted that the plaintiff had the freedom to carry out his duties as he wished, save for the fact that he could not perform additional services for customers without the defendant's approval, he had to wear the defendant's uniform, he had to follow certain minimum specifications for the installations, and he had to call the defendant to confirm he had completed the installation and report and problems that may have arisen.). *See also Herman*, 164 F.Supp.2d at 672 (the court rejected the plaintiffs' argument that having to comply with the defendant's specifications and policies, the requirement to wear uniforms, having little ability to alter routes, and having to check in regularly with the defendant meant that the defendant exercised significant control over the technicians. The court stated that having to comply with the defendant and Comcast's installation specifications was "entirely consistent with the standard role of a contractor who is hired to perform highly technical duties.").

But other courts, and, here, the Court finds that the way in which Plaintiffs have testified that Defendant interacted with them in each of these categories evidences an amount of control similar to an employer/employee relationship. Again, as stated above Plaintiffs have submitted evidence that Defendant offered them cable jobs on a take-it-or-leave-it basis–regarding payment for the jobs, geographical areas, and time ranges for completing the job–did not allow technicians, generally, to pick the jobs they wanted or to rearrange their schedules, mandated a six and sometimes seven-day workweek, checked on them throughout the day, required them to check in, required them to receive a "clear

23

code" before they left for the day, required them to stay in various geographical areas in case a customer in that area may need cable services (without paying them), required them to complete jobs that Defendant added on during the day or assist another technician in the area, and used backcharges as a punishment and not solely to ensure quality. Viewing these factors and the testimony together, and in a light most favorable to Plaintiffs, Defendant had more than a say in Plaintiffs' workday, it had control of it.

This case is more akin to *Scantland* regarding Defendant's control over Plaintiffs' day. 721 F.3d at 1312-13. In *Scantland*, the court found that the defendant exercised significant control over the plaintiffs "such that they did not stand as 'separate economic entities' who were 'in business for themselves.'" *Id.* The court found in favor of an employee status, in part, because of the control the defendant exercised over the plaintiffs' day. *Id.* The court pointed out that the defendant required the technicians to report to the warehouse between six and seven a.m., at which time the defendant assigned the plaintiffs new assignments. *Id.* The plaintiffs testified that they could not decline the new assignments without a threat of termination or being refused work in the following days. *Id.* at 1313. The court further noted that the technicians could not refuse a route that was unprofitable–whether a low paying job or a job that was far away. *Id.* The plaintiffs additionally testified that the defendant might have required them to attend quality control meetings and classes on new equipment and participate in monthly equipment inventory checks. *Id.* at 1313-14. The plaintiffs added that, during downtime, the defendant occasionally required them to assist other technicians with their jobs and that they could not refuse the defendant. *Id.* The court also pointed out that some technicians testified that the defendant required them to stay in a geographic area until all of the technicians in the area were finished; only then

24

were they 'free to go,' all the same time. *Id.* The court also found that testimony existed that the defendant had a large degree of oversight over the technicians, for the technicians were required to communicate with dispatch routinely during the day and were required to log in and out of a phone application service to indicate when they arrived on the job, when they completed the job, and when they estimated they would arrive at their next job. *Id.* The court further noted that the defendant often conducted site checks of their technicians' work and tracked the technical "quality control discrepancy rate." *Id.* 1314. The court also found that testimony existed that the cable technicians worked over forty hours per week and that the defendant often required the technicians to work six or seven days per week. *Id.* at 1314-15. *See also Santelices v. Cable Wiring and South Florida Cable Contractors, Inc.*, 147 F.Supp.2d 1313, 1321 (S.D.Fla. 2001) (finding that an issue of fact existed as to the independent contractor/employee status because there were disputes about the control factor. ) In *Santelices,* the court noted that the plaintiff testified that he was required to report to the defendant's warehouse at a specific time to receive work and that, if he did not report at that time, he believed he would be fired, reprimanded, or suspended. *Id.* The plaintiff also testified that, if he arrived late, the defendant would reprimand him or suspend him for arriving late and would reassign his assignments to other technicians. *Id.* The court also noted the plaintiff submitted testimony that if he refused extra work orders, he would be penalized. *Id.* The court also found relevant the testimony that the plaintiff was required to "maintain periodic communication with the company throughout the day by using the company's two-way radio." *Id.* at 1322.

Given Plaintiff's testimony, even Cook's testimony that he was able to take summers and extended periods of time off and the possibly conflicting days worked that Plaintiffs

report, the Court finds that this elements weighs in Plaintiffs' favor.

<u>Chargeback system as punishment and to enforce compliance with rules</u>

All the plaintiffs testified that Defendant assessed chargebacks on cable technicians. (E.g., Swinney Dep. at 84; Lance Aff. ¶ 18.)  While the use of chargebacks, generally and in theory, courts have found, is an appropriate way to control an independent contractor's quality of work, when a defendant cable installation company begins using the chargeback as a means of punishing or reprimanding a technician and the chargeback does not correlate to the actual damages incurred, courts also have not been hesitant to find that that abuse evidences an employee/employer relationship.

Cook explained that, as time progressed, Defendant started charging workers if they were late, because Bright House had adopted a policy that credited customers twenty dollars if the cable technician was late. (Cook Dep. at 47.)  Cook added that Defendant often, but not always, passed along the chargeback.  (*Id.* at 47-48.)  Lance stated that he was unable to contest because the backcharges appeared on his paycheck three to four weeks after the alleged backcharges were incurred. (Lance Aff. ¶ 18.)

Moore stated Defendant would backcharge him if he did not report to the White Lake warehouse six days per week, no later than seven a.m.  (Moore Aff. ¶ 3.)  If he showed up late, Moore added, Defendant would backcharge him money from his paycheck.  (*Id.*)  Moore also added that Defendant "sometimes" required him to work seven days per week. (*Id.* ¶ 4.)  Lance primarily echoed Moore's statements.  (Lance Aff. ¶¶ 18-22.)  He added, though, that he did try to contest a backcharge, but that he "never got any where" when he contested the charge. (*Id.* ¶ 22.)

Schultz explained how the chargeback system worked and how he distinguished it

26

from how he treated his employees.  Schultz stated that Defendant's employees had a bonus incentive program.  He explained that, if the employee produced $1000.00 of work, and his wages were $700.00, then the employee would receive the $300.00, provided that the employee did all the jobs properly and did not break anything.  (Schultz Dep. at 101.) Schultz stated, if the employee did not complete the job properly or broke something, he would not be entitled to the bonus.  (*Id.*)  Schultz stated that the bonus was not akin to a chargeback, which Defendant solely used for independent contractors.  (*Id.*)

Schultz stated that he used his discretion in deducting amounts from his employees' bonuses.  (Schultz Dep. at 103.)

Schultz stated that he had more control over the quality of the work that his employees did versus the independent contractors.  (Schultz Dep. at 107.)

Schultz stated that the independent contractors often had "a little more steam" because they were paid by the job; so an incentive existed to work quickly.  (*Id.* at 106.) Schultz explained that that incentive to hurry often caused work quality problems which Schultz could not control as well as he could control Defendant's employees. (*Id.* at 107.)

Schultz stated that he only had the ability to backcharge his contractors to enforce quality standards.  (Schultz Dep. at 107-08.)  Schultz stated, though, that he used his discretion when backcharging contractors because he knew that Bright House and Charter often charged "crazy amounts" for the work.  (*Id.*)  Schultz explained that there were jobs on which the contractor would make eight dollars and if the contractor did not tighten a connector tightly enough, the cable company would charge Defendant one hundred dollars. (*Id.* at 109.)  Schultz stated that he would not charge the one hundred dollars.  (*Id.*)

Schultz stated, if the cable company backcharged Defendant for a job that an

27

employee worked on, Defendant would sometimes take that backcharge out of the employee's potential bonus.  (Schultz Dep. at 109-10.)

Here, the Court finds that testimony exists that Defendant used the backcharge system to charge Plaintiffs not only for quality control, but also for punishment for being late or not attending meetings.  This use of the backcharge is impermissible and evidences control over the contractor akin to control over an employee.  *See Herman*, 164 F.Supp.2d at 672-76 (stating that the backcharges did not indicate control "in the sense of an employer's control over an employee."  The court reasoned that "[i]t is common in contractual relationships for the client to withhold money if work is not done correctly.") *versus Scantland,* 721 F.2d at 1314-16 (finding that the defendant cable installation company used the chargebacks not only for quality control but for incorrectly using the phone application, misplacing inventory, or being late to a job.  The court also found that the chargebacks did not correlate to a contractual relationship, as the *Herman* court found, because the chargebacks were a flat rate and could exceed the job value.  The court held that it viewed the chargeback more as a disciplinary measure and not consistent with an independent contractor relationship, which would have contemplated chargebacks being the cost of actual damages.).

The Court notes that Schultz testified that he "sometimes" but not always passed along the chargeback/fees to both his employees and the independent contractors.  The fact that he treated his in house technicians the same way as he treated his independent contractors also weighs in favor of an employee status finding.

Control conclusion

Given the above discussed factors and testimony, the Court finds there is a genuine

28

issue of material fact.

### 5. Opportunity for profit or loss

"The extent to which an individual is able to 'generate more money based on skill and hard work' may tend to establish independent contractor status." *Scruggs*, 2011 WL 6026152 at *6 (quoting *Herman v. Mia-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 674 (D. Md. 2000), *aff'a sub nom Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001)). The Court finds that this factor weighs in favor of employee status, for, in a light most favorable to Plaintiffs, the testimony indicates that Plaintiffs did not have a choice as to the geographical location they could work in, they rarely had a choice as to the types of jobs they chose (high paying versus low paying), they had to make themselves available during down times, for Defendant could add a job whenever or request Plaintiffs to assist others. (*See* Swinney Dep. at 63 (stating that he did not have the freedom to turn down the job that Defendant assigned him.), Swinney Dep. at 139, 141 (stating that he had to stay in the area in which Defendant was doing jobs, while offering his services to Defendant, but finding nothing to do.); Wardell Dep. at 89 (stating that he was not able to select his own route or the types of jobs he was willing to do), Wardell Dep. at 103 (testifying that Defendant required him to finish his work and then required him to go out and help another technician or pick up another job).

Cook provides a greyer case, for his testimony reveals a finer line between independent contractor and employee status. Cook stated that his supervisor, Kevin Goff, allowed him to choose, about ten times, the routes that he wanted. (Cook Dep. at 56.) Cook stated Goff allowed him to do so because Goff though that Cook was a good worker. (*Ia.*) This ability to have some choice weighs in favor of a independent contractor

29

relationship. But, Cook also stated that he had to remain logged into his phone while working because Defendant could assign him a job at anytime and he would have to do it. (*Id.* at 65.) Cook also testified that he did have specialized skill that other technicians did not have, so he was able to do more jobs than other technicians were able to do. (*Id.* at 82.) But again, while that may have been the case, Cook testified that he still had to ask permission from Defendant to go home, because if Defendant had another technician who needed help or if Defendant needed Cook to pick up another assignment, Cook would have to do it. (*Id.* at 86, 111-12.) Cook also stated that he was not able to subcontract his work and that there were some periods during the summer when Defendant told all technicians that working a six-day week was mandatory. (*Id.* at 107.)

Plaintiffs' affidavits support employee status regarding this factor. Moore stated that he could not reject any work, lest he receive no work for the day. (Moore Aff. ¶ 8.) He also stated that Defendant would not allow him to choose the geographic area to work in. (*Id.* ¶ 9.) Moore alleged that Defendant would "frequently" take one of his assigned jobs away from him during the middle of the day; and sometimes rerouted higher paying jobs to someone else. (*Id.* ¶ 11.) And Moore maintained that, three to four times per week, defendant would require him to stay in his truck in the area he was servicing to see if any of Defendant's customers would need him for the five to seven p.m. time slot; he added that Defendant would not pay him for those jobs, and that he was not free to turn down jobs, even if he did not want them. (*Id.* ¶ 15.)

Lance's affidavit mirrored Moore's in these respects. (Lance Aff. ¶¶ 12-18.) Lance added that he only worked for Defendant because he had no other time to work for any other customer because Defendant required him to accept every job and day stay in certain

30

towns throughout the day to see if more jobs would come in.  (*Id.* ¶¶ 23, 24.)

Cross's affidavit mirrors Lance and Moore's as well.  (Cross Aff. ¶¶ 8-10.)

A fact issue again exists to this element.

### 6.  Installation services and Defendant's business

The sixth and final factor considered in the Sixth Circuit's economic realities test requires the Court to consider whether the services Plaintiffs provided were an integral part of Defendant's business.   Here, Plaintiffs' cable technician services were an integral part of Defendant's business, albeit a diminishing integral part.  (*See* Schultz Dep. at 40-41, 45; Smith Dep. at 14-15 (stating that Defendant had been decreasing its reliance on independent contractors throughout the previous five years; but also stating that Defendant's practice was first to staff all the assignments with its employees, and then, if jobs remained, to have independent contractors fill those jobs.)).  Given the necessity of the technicians to fulfill daily cable installation requirements, the Court finds this factor favors finding an employee status.  But, the Court notes, as other courts addressing this factor under similar circumstances have noted,  that "this factor, standing alone, does not create an employment relationship" covered by the FLSA.  *Chao*, 16 F. App'x at *3-4.  *See also, Freuna*, 185 F. App'x at 784 (same); *Bennett*, 2013 WL 4804841 at *10 (same); *Scruggs*, 2011 WL 60226152 at *8 (finding that, although "cable installation technicians are the lifeblood of Skylink" and "this factor superficially contributes to the inference" that the plaintiffs were Skylink employees, "other courts have found on similar facts that this factor alone cannot alter the overall impression that . . . installers are economically independent.") (internal quotation marks and citations omitted).

### 7.  Analysis of factors

As the *Scruggs* court observed, there is a split in the courts considering the issue whether cable or internet installers are independent contractors or employees under the FLSA.  *See Scruggs*, 2011 WL 6026152 at *8, *8 n.9 (citing cases).  Each of those courts decided the issue, however, based on the facts before them.  This Court does the same. Applying the relevant law and considering the evidence presented in the light most favorable to Plaintiff, the Court concludes that Plaintiffs have created genuine issues of material fact as to the factors the Court must look to in the economic realities test in order to determine whether Plaintiffs were independent contractors or employees.  The Court therefore DENIES Defendant's motion for summary judgment and sets this issue for a bench trial to start on August 14, 2014.

### B. Plaintiffs' motion to stay discovery and for protective order

Plaintiff's have filed a motion to stay discovery and for a protective order.  (Dkt. 112.) Plaintiffs allege that Defendant is noticing depositions for and serving written discovery on the opt-in plaintiffs and that the opt-in plaintiffs are now dropping out of the case.  Plaintiffs allege that Defendant is using the notices of deposition and written discovery to influence the outcome of the case.

Plaintiffs request that the Court stay all further notices or written discovery until after the Court rules on the other motions the Court is hearing today.  Plaintiffs state that there is no discovery cut–off date in the case at the moment.  Plaintiffs state that, depending upon the results of the motions, the parties may need to engage in limited discovery.

The Court DENIES Plaintiff's motion.  Defendant may take discovery.  The Court limits the discovery, though:

- within seven days of this order, Plaintiffs must produce a witness list to Defendant

32

as to which witnesses Plaintiffs will use at trial;

- Defendant, within fourteen days of the witness list, may serve discovery requests and conduct depositions on any witness whom Defendant has not yet served discovery requests on or taken the deposition of;

- Defendant may only take discovery related to the independent contractor/employee issue;

- all discovery must be completed by July 23, 2014;

- the Court requires Defendant to produce a witness list, as well, by the date listed above; Plaintiffs may, under the timelines set forth above, serve discovery and take the deposition of any witness Defendant plans to call at trial, whom Plaintiffs have not already deposed or received discovery from.

## C. Scheduling dates

At the hearing on June 18, 2014, the Court set forth the following dates:

Final pretrial Order to chambers by:  July 31, 2014.

Final pre-trial conference:    August 7, 2014, 10 a.m.

Trial date:                    August 14, 2014, 8:30 a.m.


So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 24, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 24, 2014, by electronic and/or ordinary mail.

33

s/Carol J. Bethel
Case Manager